Bakhaus and Burke, Incorporated v. Commissioner.
Bakhaus & Burke, Inc. v. Commissioner
Docket No. 49166.
United States Tax Court
T.C. Memo 1955-227; 1955 Tax Ct. Memo LEXIS 112; 14 T.C.M. (CCH) 919; T.C.M. (RIA) 55227; August 12, 1955
*112 Held: The amount of $131,670.16 designated on the corporation's books as an account payable to stockholders was a bona fide obligation of petitioner. Held further: The amounts accrued in each of the fiscal years ended February 28, 1949 (as adjusted), February 28, 1950, and February 28, 1951 as interest on the account payable to the extent of 4 per cent are allowable as interest deductions within the scope of section 23(b), Internal Revenue Code of 1939. William R. Bagby, Esq., and James Park, Esq., for the petitioner. James F. Shea, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in income tax for the taxable years ended February 28, as follows: 1949
$1,343.30
1950
2,443.30
1951
4,366.04
Total
$8,152.64
*113 Although the full amount of the deficiency determined by the Commissioner was placed in issue in the petition, specific error was not raised as to certain of the item adjustments either in the pleadings or at the hearing. Accordingly these adjustments are, hereby, deemed conceded. The issues in this proceeding are: Whether the amount of $131,670.16 treated on the corporation's books as an account payable to stockholders was a bona fide obligation of petitioner. If so, what portion of the amount accrued in each of the fiscal years ended February 28, 1949, 1950, and 1951 as interest on the account payable is allowable as a deduction for interest within the purview of section 23(b), Internal Revenue Code of 1939. Findings of Fact Petitioner is a Kentucky corporation with its principal office in Lexington, Kentucky. During the years here involved it maintained its books on the accrual method of accounting and filed its income tax returns with the collector of internal revenue for the district of Kentucky. In its income tax returns for the fiscal years ended February 28, 1949, 1950, and 1951 petitioner deducted $12,667.62, $6,133.50, and $6,133.50, respectively, as interest on *114 "stockholders' advances." In determining the asserted deficiencies respondet has disallowed these deductions claiming that they were dividends. During the years here reviewed petitioner was in the wholesale liquor business, having been organized for that purpose in February 1947. Petitioner had begun business on March 1, 1947, under the name of United Wholesale Liquor Co., Inc. (hereinafter sometimes referred to as the corporation). However, on December 29, 1953, after the period involved, the name was changed to Bakhaus and Burke, Inc. The corporation was the successor to a partnership which owned and operated the same business under the name of United Wholesale Liquor Co. (hereinafter referred to as the partnership). The three sole members of the partnership were the organizers, officers, directors, and sole stockholders of the corporation during the period here reviewed. The partnership had been formed in July 1944, by J. S. Mahan, O. A. Bakhaus, and D. J. Burke. It began business with a capital of $30,000, each partner having contributed $10,000. As of February 28, 1947 the partners had in the partnership, in addition to their capital contribution, $131,670.16 in undistributed *115 profits on which the Federal income tax had been paid by the partners. The partnership was very successful, having a total net profit during its existence of two years and eight months in the amount of $305,273.80. The partnership dealt in blended whiskies and had no source of supply for the more desired bonded whiskies. Subsequent to World War II and during the life of the partnership blended whiskies sold readily as there was no appreciable amount of bonded whisky on the market. Early in 1947, however, distillers began releasing bonded whiskies and by the first part of 1948 the supply caught up with the demand. The organizers anticipated for the corporation a continuation of the large volume of sales and rapid turnover of inventory enjoyed by the partnership. However, immediately after its organization, the corporation was hit by a slump in its business. A comparison of the sales by the partnership during its last year and by the corporation during its first twelve months is shown by the following schedule: PARTNERSHIP
March 1946 to Feb. 1947
inclusive
1946
March 31
$ 225,447.86
April 30
244,761.24
May 31
144,158.60
June 30
299,786.02
July 31
364,917.05
Aug. 31
356,255.55
Sept. 30
189,463.12
Oct. 31
137,556.87
Nov. 30
205,597.98
Dec. 31
183,444.75
1947
Jan. 31
168,449.06
Feb. 28
178,643.04
Total
$2,698,481.14
CORPORATION
March 1947 to Feb. 1948
inclusive
1947
March 31
$ 77,852.27
April 30
98,312.83
May 31
77,687.75
June 30
69,529.72
July 31
84,004.60
Aug. 31
64,230.27
Sept. 30
82,848.13
Oct. 31
133,960.78
Nov. 30
82,950.01
Dec. 31
116,932.68
1948
Jan. 31
77,468.26
Feb. 28
54,677.41
Total
$1,020,454.71
*116 Net sales and net income of the partnership during its existence and of the corporation during its fiscal years 1948 through 1951 are as follows: Partnership
Fiscal Year Ended
Net Sales
Net Profit
June 30, 1945
$1,210.630.66
$ 85,851.70
June 30, 1946
2,093,568.12
131,091.04
7/1/46-2/28/47
1,769,559.75
88,331.06
Total
$5,073,758.53
$ 305,273.80
Corporation
Fiscal Year Ended
Net Sales
Net Profit
Feb. 28, 1948
$ 981,912.72
$ (10,103.93)
Feb. 28, 1949
918,946.69
3,676.54
Feb. 28, 1950
858,719.70
4,924.31
Feb. 28, 1951
1,298,592.85
26,319.28
Total
$4,058,171.96
$ 24,816.20
Both the partnership and the corporation financed inventories through the use of warehouse receipts. It was the custom of the corporation, as well as the partnership, to pay 10 per cent of the price of its purchases in cash and borrow 90 per cent of the purchase price from a commercial bank on its note. These notes were secured by warehouse receipts issued by the Lawrence Warehouse Co. of Chicago (hereinafter referred to as Lawrence), pursuant to a contract with the partnership or corporation whereby Lawrence agreed to store in its warehouse merchandise *117 delivered by the United business, and to hold the merchandise until the warehouse receipts were returned. To remove the liquor from the warehouse the partnership or corporation had to pay the bank the cost of the merchandise to be removed. As a courtesy, however, the bank permitted the removal of some merchandise without immediate payment but on a 20-day paying basis. There was no limit on the amount of liquor which could be financed under this plan. The partners decided to incorporate their business in February 1947 and on February 25, 1947 the United Wholesale Liquor Co., Inc. was formed with stated capital of $30,000 and an authorized capital stock of 1,500 shares of no par value. On February 28, 1947 the organizers agreed in writing with each other that all partnership property should be conveyed to the corporation. They fixed the net worth of that property at $30,000 and agreed to receive as their consideration 1,500 shares of stock, 500 shares to each. The partnership assets were conveyed to the corporation pursuant to a subscription agreement for 1,500 shares of stock, dated March 1, 1947 and signed by Mahan, Bakhaus and Burke. Upon transfer of the partnership property *118 the partners received 500 shares each of the corporation's no par stock. Subsequently, on March 3, 1947, the board of directors met and ratified the agreement entered into by the three organizers on February 28, 1947. During all the pertinent years the partnership and the corporation employed the same accountant, William A. Hifner, Jr., and the same bookkeeper, L. C. Edenfeld. Although Hifner did not audit the books of the partnership and corporation he was frequently consulted by the bookkeeper and the organizers. He was always consulted about the closing of the books and the necessary entries therefor. Hifner also prepared the individual income tax returns of the organizers for all the years here concerned, the partnership returns, as well as the corporation returns herein involved. Toward the latter part of March 1947 Edenfeld went to Hifner's office seeking aid in setting up the corporation's books. The accountant was theretofore unaware of the corporation's existence. Several conferences ensued between Hifner, Edenfelt, Burke, Mahan, and the corporation's attorney in regard to the treatment of the $131,670.16 undistributed partnership profits. At the time of petitioner's *119 formation the partners had agreed to loan these profits to the corporation; however, they had not worked out the details of the loan. It was the desire of the organizers to get this money out of the corporation as soon as possible without prejudicing the rights of its creditors. After considering several possibilities, including the issuance of bonds and notes and borrowing from a third party to pay the incorporators, it was determined that it was best to leave this sum as an account payable and draw against it by demand as the corporation made up the money. Hifner then prepared in toto a rough pencil draft of the partners' offer (which embodied the partnership balance sheet of February 28, 1947) and the corporation's acceptance, the finished copy of which (hereinafter referred to as the sales agreement), provides as follows: "Lexington, Kentucky, March 1, 1947 "To the Officers and Directors, United Wholesale Liquor, Company, Incorporated, Lexington, Kentucky. "Gentlemen: "We, the undersigned, have heretofore conducted the business known as United Sholesale Liquor Company as a partnership, and each of the undersigned owns an undivided one-third interest in said business. *120 "As at the close of business on February 28, 1947, the assets and liabilities of said business consisted of the following: Assets
Cash on hand and in bank
$ 7,129.21
Accounts Receivable - Sales
in Transit
69,757.54
Accounts Receivable - Depos-
its on Purchases
7,815.34
Accounts Receivable - Sales-
men
765.00
Equipment at Depreciated
Costs
3,639.96
Inventory - Merchandise at
Cost
215,425.68
Inventory - Ky. Tax Stamps
at Cost
37,603.16
Good Will, Paid for in Cash
12,399.76
Total Assets
$354,535.65
Liabilities
Accounts Payable
$ 250.00
Notes Payable, Citizens Bank
& Trust Co. *
192,057.41
Accrued Taxes
558.08
Total Current Liabilities
$192,865.49
Net Worth
161,670.16
Total Liabilities
$354,535.65
"We propose to sell and assign to you the foregoing assets amounting to $354,535.65 together with the trade name of United Wholesale Liquor Company, in consideration of your assumption and payment of the current liabilities amounting to $192,865.49, and the further consideration that you issue to us 1,500 shares of your fully paid up non-assessable *121 capital stock, and the further consideration that you pay to each of us, in cash, the net sum of $43,890.05, with interest at 4% per annum from March 1, 1947, until paid. "Your acceptance below will constitute a contract between us. "(s) J. S. Mahan / (J. S. Mahan) (s) D. J. Burke / (D. J. Burke) (s) O. A. Bakhaus / (O. A. Bakhaus)" "Lexington, Kentucky, March 1, 1947. "The United Wholesale Liquor Company, a Kentucky Corporation, hereby accepts the foregoing offer by Messrs. Mahan, Burke, and Bakhaus and agrees to take over said assets and assume said liabilities in strict accordance with the terms of said offer. "The United Wholesale Liquor Company, By /S/ J. S. Mahan President. "Attest: /S/ O. A. Bakhaus / Secretary." At the time of petitioner's organization or immediately thereafter, Edenfeld was advised by the organizers that the $131,670.16 was a debt of the corporation, payable on demand. In accordance with these instructions and the sales agreement the bookkeeper treated the $131,670.16 as a corporate debt. Entries were made showing accounts payable to the stockholders in the following amounts: J. S. Mahan
$43,890.05
O. A. Bakhaus
43,890.05 *
D. J. Burke
43,890.05
*122 The corporation issued no notes or other evidence of indebtedness to its shareholders. On January 9, 1948 the corporation paid $9,000 on the debt by issuing a check for $3,000 to each of the three stockholders. Appropriate entries were made on the corporation's books reflecting these disbursements as partial payment of the $131,670.16 debt. Lacking sufficient funds the corporation paid no interest in the 1948 fiscal year and, because of the bookkeeper's negligence none was accrued on the corporation's books for that year. On February 28, 1949 the amount of $12,667.62 was accrued on the corporation's books as interest on the debt for the period March 1, 1947 to February 28, 1949. The entry read as follows: "1949 Feb. 28 To former partners 3/1/47 - 2/28/49 $12,667.62" Since $3,000 was paid to each of the shareholders on January 9, 1948 the interest computation for the first ten months and nine days was on $131,670.16 and the interest for the remainder of the period and for all other times thereafter was computed on $122,670.16. On April 21, 1949 three checks for $4,222.54 (totalling $12,667.62) were issued, one to *123 each of the three organizers. Each check stated that it was issued for "Interest thru 2/28/49 on money left in company." The checks were entered in the cash journal and posted from there to the general ledger. The sales agreement called for four per cent interest on the debt to the organizers. However, during the years involved the bookkeeper, acting on instructions from the corporation's officers, computed and the stockholders received interest on the debt at the rate of five per cent. No new consideration was given to the corporation by the organizers for the additional one per cent interest. During the 1950 fiscal year the interest on the debt to the organizers was accrued on the corporation's books in May and June for the first four months of the fiscal year and thereafter the interest was accrued by the month, so that on February 28, 1950 the amount of $6,133.50 had been accrued. On February 28, 1950 three checks for $2,044.50 (totalling $6,133.50) were issued, one each to the three organizers. Each check stated that it was issued for "Interest 3-1-49 to 3-1-50." Entries were made on the corporation's books reflecting these disbursements as payments of accrued interest. *124 During the fiscal year 1951 interest on the debt to the organizers was accrued on the corporation's books by the month, so that on February 28, 1951 the amount of $6,133.50 had been accrued for the year. On February 28, 1951 three checks for $2,044.50 each (totalling $6,133.50) were issued, one each to the three shareholders. Each check stated on its face that it was issued for "Interest March 1 1950 to Feb. 28 1951." The debt to the corporation shareholders was reported by the corporation in its income tax returns for the fiscal years ended February 28, as follows: Accounts Payable - Stockholders
1947 *
$131,670.16
1948
122,670.16
1949
135,337.78 **
1950
122,670.16
1951
122,670.16
In their individual income tax returns for the years 1949, 1950, and 1951 the stockholders reported as income the interest received from the corporation by checks issued to each of them in the amounts of $4,222.50, $2,044.50, and $2,044.50. In June 1952 Mahan sold his United stock to Bakhaus and Burke who in turn sold it to the corporation. *125 Bakhaus and Burke paid Mahan in full the balance of $40,890.05 due him from the corporation on the debt. Bakhaus and Burke continued the corporation, until they sold all business assets on June 26, 1953 for $232,290.42. The sale resulted in a gain to the corporation of $43,935.62. As payment for their interests (including the sum paid Mahan on his retirement from the business) the corporation issued checks to Bakhaus and Burke on July 10, 1953, as follows: O. A. Bakhaus
$40,890.06
D. J. Burke
40,890.05
Bakhaus & Burke
41,571.55 Each check stated that it was issued for "Purchase Contract Payable." During the existence of the partnership and the corporation Kentucky State law required that alcoholic beverages be purchased solely by cash. The account payable of $131,670.16 (reduced to $122,670.16 on January 9, 1948) on which certain amounts were paid in each of the fiscal years ended February 28, 1949, 1950, and 1951 was a bona fide obligation of petitioner and the amounts so paid to the extent of four per cent were interest payments. Opinion The sole question presented by this appeal is whether the sums paid by petitioner to its stockholders as interest *126 were in reality interest payments or distributions in the nature of dividends. Unlike many of the decided cases we do not have here a case which involves "hybrid securities," instruments which have some of the characteristics of both debentures and stock certificates, and the problem has been to determine which they were. Cf. John Kelley Co., 1 T.C. 457, affd. 326 U.S. 521; Talbot Mills, 3 T.C. 95, affd. 326 U.S. 521; Sabine Royalty Corporation, 17 T.C. 1071; New England Lime Co., 13 T.C. 799; Swoby Corporation, 9 T.C. 887. The facts in the instant proceeding closely approximate those in cases in which we have been faced with deciding whether a debt instrument perfect in form is in fact representative of a proprietary interest in the corporation. Cf. Gooding Amusement Co., 23 T.C. 408 (on appeal C.A. 6); Gazette Telegraph Co., 19 T.C. 692, affd. without discussion of this point, 209 Fed. (2d) 926; Tribune Publishing Co., 17 T.C. 1228; Toledo Blade Co., 11 T.C. 1079, affd. 180 Fed. (2d) 357, certiorari denied *127 340 U.S. 811. In the case at bar all of the requirements of form necessary to make the transfer of the $131,670.16 undistributed partnership profits an indebtedness of the corporation were met. It was either a debt and effective as such or being purely formal and without substance was ineffective to make the payments herein involved interest. The question whether the sum transferred gave rise to an indebtedness or to a proprietary interest depends upon the objective intent disclosed by all the pertinent factors in the case and not the formal manifestation of intent declared by the taxpayer. Isidor Dobkin, 15 T.C. 31, affd. 192 Fed. (2d) 392. Cf. Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 Fed. 2d 718. Respondent maintains that every substantive factor in the instant case supports the conclusion that there was no intent to create an indebtedness. Respondent argues that the partners' agreement of February 28, 1947 and the subscription agreement of March 1, 1947 represent a closed transaction transferring the partnership assets to the petitioner for 1,500 shares of stock without mention of a loan. He suggests that *128 the sales agreement was a mere after thought effectuated only after petitioner determined that advantageous tax consequences would flow from a characterization of indebtedness. The record clearly establishes that at the time of petitioner's formation it was the desire and intention of the partners to loan their undistributed profits to the corporation. The partners, however, did not then work out the particulars of the loan. Shortly after the transfer of the partnership assets and in the same month the incorporators consulted with their accountant, bookkeeper, and attorney with regard to the details of the loan. The resulting sales agreement was no more than the formalization of the understanding existing between the partners prior to March 1, 1947. The actual time of the execution of this document is of no consequence in view of the fact that the partners had agreed on the basis on which they were going to organize and operate the corporation. The subsequent actions of the parties and the treatment on the corporation's books are clearly consistent with the disclosed intent of the parties. Similarly, we find no basis for respondent's claim that petitioner was "thinly capitalized. *129 " Certainly a material amount of capital was invested in stock. Moreover no good reason has been suggested why a contributed capital sufficient for the partnership would not be sufficient for the corporation. Petitioner succeeded to a well established and very successful going concern. Its predecessor had been in operation almost three years and had reaped profits of more than $305,000. Its organizers anticipated a continuation of the large profits and rapid turnover of inventory enjoyed by the partnership. There was neither change in the capital maintained by the partnership during its existence nor reason to suspect the need for any addition thereto. Further there was no need for a large amount of cash on hand as the corporation could borrow 90 per cent of the purchase price of its inventory. Contrary to a claim by respondent the record is completely devoid of any evidence which indicates that the $131,670.16 was a part of the contributed capital of the partnership rather than part of its working capital. Lastly respondent relies upon the failure of the stockholder-creditors to demand payment of the debt. The following language from Earle v. W. J. Jones & Son, 200 Fed. (2d) 846, 850 *130 is particularly dispositive of this contention: "* * * Certainly failure to attempt to collect a debt does not per se destroy its character as such; and the same strict insistence upon payment on the due date as would be the case if a bank were the creditor should not be expected where a shareholder, or one who is closely identified therewith, is a creditor. * * *" We must next consider whether all or only a portion of the sum paid in each of the years reviewed as interest on the $131,670.16 (reduced to $122,670.16 on January 9, 1948) is allowable as a deduction for interest within the purview of section 23(b), [1] Internal Revenue Code of 1939. Petitioner claims interest deductions in the amounts *131 of $12,667.62, $6,133.50, and $6,133.50 for the fiscal years ended February 28, 1949, 1950, and 1951, respectively. The amount claimed by petitioner for the fiscal year ended February 28, 1949 was arrived at by computing the deduction at five per cent per annum over a period from February 28, 1947 to February 28, 1949, which period includes two of petitioner's taxable years. It is fundamental that interest accrues ratably over the period of the loan, Higginbotham-Bailey-Logan Co., 8 B.T.A. 566; J. B. Jemison, 18 B.T.A. 399, and that a taxpayer on the accrual method of accounting as petitioner herein must take deductions for interest in the periods within which the liability to pay interest occurs, regardless of when payment is made. United States v. Anderson, 269 U.S. 422; American National Co. v. United States, 274 U.S. 99; Warner Co., 11 T.C. 419, affd. 181 Fed. (2d) 599. Thus the petitioner cannot include in its deduction for interest in the fiscal year ended February 28, 1949 interest that accrued in the fiscal year ended February 28, 1948. Further, the sales agreement called for interest at four *132 per cent but when the payments in question were made they were at the rate of five per cent. Contrary to a claim by petitioner we found no new consideration given by the incorporators for the increased rate. Therefore, as there was no enforceable obligation for the payment of the additional one per cent by petitioner only those amounts accrued (as adjusted for the 1949 fiscal year) as interest on the account payable to the extent of four per cent are allowable as interest deductions within section 23(b), Internal Revenue Code of 1939. Autenreith v. Commissioner, 115 Fed. (2d) 856, affirming 41 B.T.A. 319. Decision will be entered under Rule 50. Footnotes
*. [This liability was fully secured by merchandise in the Lawrence warehouse.]↩
*. On brief petitioner lists this amount as $43,890.06.↩
*. Shown on partnership balance sheet of February 28, 1947. ↩
**. Includes $12,667.62 interest accrued on debt as of February 28, 1949.↩
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(b) Interest. - All interest paid or accrued within the taxable year on indebtedness, except on indebtedness incurred or continued to purchase or carry obligations (other than obligations of the United States issued after September 24, 1917, and originally subscribed for by the taxpayer) the interest upon which is wholly exempt from the taxes imposed by this chapter.↩